**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-1845

———————

ANGELIKA LAMONT,
Administrator *Ad Prosequendum* of the
Estate of Eric J. Quick,

Appellant

v.

STATE OF NEW JERSEY;
NEW JERSEY STATE POLICE DEPARTMENT;
MARK MANZO;
CHRISTOPHER MODARELLI;
KEITH MOYER,
JOHN DOES, A-Z, fictitious names, police officers,
supervisors, trainers, instructors, employees, agents and/or
servants of the STATE OF NEW JERSEY and/or NEW
JERSEY STATE POLICE DEPARTMENT, jointly,
severally, individually and/or in the alternative

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 1-04-cv-02476
District Judge: The Honorable Noel L. Hillman

Argued January 25, 2011

Before: McKEE, *Chief Judge*, and SMITH, *Circuit Judges*
and STEARNS, *District Judge**

(Filed: March 4, 2011)

Andrew M. Smith (argued)
Amanda J. Houpt
Smith, Marcino & Bowman
208 North Easton Road
Willow Grove, Pennsylvania 19090
*Counsel for Appellant*

John C. Connell (argued)
John P. Kahn
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033
*Counsel for Appellees*

_____

OPINION

_____

SMITH, *Circuit Judge.*

---

* The Honorable Richard G. Stearns, United States District Judge for the District of Massachusetts, sitting by designation.

This civil-rights case was filed after law enforcement officers shot and killed a suspected car thief during a standoff. Immediately prior to the shooting, the suspect had been standing with his right hand concealed in his waistband and appeared to be clutching an object. After being ordered both to show his hands and to freeze, the suspect suddenly pulled his right hand out of his waistband—not as if he were surrendering—but as though he were drawing a gun. The sudden movement prompted the officers to open fire, leading to the suspect's death. The officers fired their guns for 10 solid seconds, shooting a total of 39 rounds. Eighteen bullets hit the suspect, 11 of them from behind. It turned out that the suspect was not clutching a weapon; he was holding a crack pipe.

The administrator of the suspect's estate filed this suit under 42 U.S.C. § 1983, asserting that the officers' use of force was unreasonable and violated the Fourth Amendment. In due course, the District Court granted a defense motion for summary judgment, holding that the officers acted reasonably as a matter of law. To the extent that the District Court held that the suspect's abrupt, threatening movement justified the officers' initial use of deadly force, we agree. However, we conclude that a jury should decide whether the force became unreasonable some time thereafter—*i.e.*, whether the officers should have ceased firing their weapons before they did. Accordingly, we will affirm in part and reverse in part.

## I[1]

The events surrounding the deadly shooting took place shortly after 10:00 p.m. on July 21, 2003. New Jersey State Troopers Christopher Modarelli, Mark Manzo, Keith Moyer, Joseph Carson, and Thomas Hollywood were at the Bellmawr State Police Station when the radio dispatcher reported that local police were in pursuit of a stolen vehicle on Interstate 295 near Route 30. The location is within the Bellmawr station's jurisdiction, so the troopers drove out to the scene. When they arrived, they were advised that the suspect, a white male wearing a white t-shirt, dark sweat pants, and no shoes, had abandoned the vehicle and fled into the woods bordering the interstate. They were also told that local police officer Robert Swanson had gone after him. Modarelli, Moyer, Manzo, and Carson went into the woods to provide backup for Swanson. Hollywood stayed behind.

The woods were dark and dense. The officers needed their flashlights just to see in front of them. At one point, Modarelli stumbled upon the suspect who was hiding under some brush. Modarelli ordered him to show his hands and surrender, but the suspect disregarded the commands and ran away. Modarelli, now joined by Moyer, followed after him. During the chase, the suspect got caught in a thicket.

---

[1] As we must, we recount the facts and draw all reasonable inferences in the light most favorable to the plaintiff, the party who opposed summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Trapped, he turned and faced Modarelli and Moyer, who drew their guns. Modarelli and Moyer shouted, "Don't make me shoot you," and (inconsistently) ordered the suspect to show his hands and to freeze. Swanson, Carson, and Manzo heard the commotion and joined Modarelli and Moyer. Manzo unholstered his gun.

The officers were standing between five and eight feet from the suspect, and had their flashlights trained on him. They repeatedly ordered the suspect to show his hands and to freeze. Modarelli, Moyer, and Manzo had their guns drawn and pointed at the suspect. Although facing the officers, the suspect's body was not square. He was standing at an angle, with his right shoulder forward. His left hand was positioned above his forehead (apparently to shield his eyes from the light), while his right hand was tucked into the left side of his waistband and appeared to be clutching an object.

Suddenly, the suspect pulled his right hand out of his waistband, not as if he were surrendering, but quickly and as if he were drawing a pistol. As the suspect made the sudden movement, Modarelli, Moyer, and Manzo opened fire. As the first shots were fired, Carson's flashlight was hit by a projectile (later determined to be a ricochet from one of the troopers' shots), and he fell to the ground. Swanson went to his aid, and after determining that he was unwounded, helped him up. Meanwhile, Modarelli, Moyer, and Manzo continued firing at the suspect. At some point, the suspect turned away from the officers, yet they kept firing, shooting him in the legs and buttocks. The suspect finally fell to the ground, landing on his stomach and facing away from the officers.

5

Swanson approached the suspect and determined that he had no pulse. He was later pronounced dead.

In all, Modarelli, Moyer, and Manzo fired continuously for ten seconds, shooting a total of 39 rounds. Modarelli and Moyer each fired 14 shots (thus emptying their magazines), and Manzo fired 11 times. Eighteen bullets struck the suspect, and 11 hit him from behind. A medical examiner identified two bullets that were likely fatal, both of which struck the suspect in the chest. The examiner could not, however, determine when during the course of the shooting the fatal bullets hit the suspect.

The suspect was later determined to be Eric Quick. It turned out that Quick did not have a gun in his right hand; he held only a crack pipe. The pipe was shaped like a cigarette—two inches long, cylindrical, and clear. A toxicology report suggests that Quick was under the influence of cocaine and heroin at the time of the incident.

II

The plaintiff is the administrator *ad prosequendum* of Quick's estate. On April 14, 2004, she filed this lawsuit in state court. In relevant part, the complaint asserts Fourth Amendment excessive-force claims against Modarelli, Moyer, and Manzo. The troopers removed the case to the United States District Court for the District of New Jersey on May 27, 2004. In 2005, the case was stayed pending the outcome of a grand jury investigation into the troopers' conduct. The grand jury ultimately declined to indict the

troopers, and the case was resumed. On May 22, 2008, the troopers moved for summary judgment, asserting the defense of qualified immunity.

The District Court granted the motion on February 25, 2009. The Court first rejected the plaintiff's argument that the use of force was necessarily unreasonable because the troopers' decision to pursue Quick into the woods—rather than set up a perimeter and use a K-9 to flush him out—was unreasonable. This argument lacks merit, the Court explained, because "the act that presumably justified the use of deadly force was not the [troopers]', but rather Quick's. The troopers did not resort to deadly force until Quick suddenly ripped his right hand from his waistband." JA 15. The Court next concluded that Quick's sudden, threatening movement justified the troopers' initial use of deadly force. Finally, the Court rejected the plaintiff's argument that there is a triable issue on whether the use of force, even if initially justified, became unreasonable as the events transpired. The Court opined, "When Quick made a sudden movement and ripped his right hand from his left waistband, the troopers, believing Quick had a gun, all fired at the same time and stopped once Quick was no longer a threat." *Id.* at 22. The Court acknowledged that "the number of bullets fired appears 'excessive' in laymen's terms," but stressed that "[t]here is no evidence that any of the troopers fired mindlessly or paused and then resumed firing after Quick was on the ground face-down." *Id.* at 22–23. The Court explained further that, although "eleven bullets struck Quick in the posterior of his body[,]" this "does not, standing alone, show that" the troopers continued firing after "Quick was no longer a

threat." *Id.* at 22 n.14.

The plaintiff appealed.

## III

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary. *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 285 (3d Cir. 2008).

## IV

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Facts that could affect the outcome are "material facts," and a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Because "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), we have recognized that a court ruling on summary judgment in a deadly-force case "should be cautious . . . to 'ensure that the officer[s are] not taking advantage of the fact that the

witness most likely to contradict [their] story—the person shot dead—is unable to testify,'" *id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Thus, a court should avoid simply accepting "'what may be a selfserving account by the officer[s]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. *Cf. Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Just as in a run-of-the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, "and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003); *see Thompson v. Hubbard*, 257 F.3d 896, 899–900 (8th Cir. 2001); *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996); *Williams v. Borough of W. Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). Our conclusion on this score is reinforced by decisions refusing to ratchet up the summary judgment standard for other types of cases. *See Anderson*, 477 U.S. at 256–57 (defamation cases requiring a showing of malice); *Wallace*, 103 F.3d at 1396 (employment-discrimination cases); *Texaco P.R., Inc. v. Medina*, 834 F.2d 242, 247 (1st

Cir. 1987) (antitrust cases); *see also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 896 (7th Cir. 2001) (Easterbrook, J., dissenting) ("[Rule 56 prescribes] a universally applicable standard; there is no room for a thumb on the scale against summary judgment in any class of cases.").

V

The District Court held that the troopers were entitled to qualified immunity on the Fourth Amendment excessive-force claims. Government officials performing discretionary functions are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is qualifiedly immune from suit, we ask (1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that "it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding that, for purposes of the second question, the right must have been clearly established in a particularized sense, such that "a reasonable official would [have understood] that what he [wa]s doing violate[d] that right"). Although we have discretion to tackle the "clearly established" issue first, *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), we will begin with the question whether the troopers violated Quick's Fourth Amendment rights.

10

A

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989); *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). There is no dispute that the troopers "seized" Quick when they shot and killed him. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (holding that "apprehension by the use of deadly force is a seizure"). The question, instead, is whether the seizure was unreasonable.

It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason "to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. In determining whether this standard was violated, we must remember that law enforcement officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Thus, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"; Monday morning quarterbacking is not allowed. *Id.* at 396; *see also Brown v. United States*, 256 U.S. 335, 343 (1921) (Holmes, J.) ("Detached reflection cannot be demanded in the presence of an uplifted knife."). Under this "standard of reasonableness

11

at the moment," *Graham*, 490 U.S. at 396, an officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force. *See id.* at 396; *Saucier*, 533 U.S. at 205; *Curley v. Klem*, 298 F.3d 271, 280 (3d Cir. 2002).

In this case, the troopers were advised that local police were driving down the interstate in pursuit of a suspected car thief, later determined to be Quick. Car theft is a relatively serious (though not inherently violent) offense. When the troopers arrived at the scene, they were told that Quick had fled into the dark, thicket-filled woods bordering the interstate. Once in the woods, Modarelli happened upon Quick and ordered him to show his hands and surrender. Quick fled. When they encountered Quick again, the troopers repeatedly ordered him to show his hands and to freeze. Quick refused to comply. Instead, he stood with his right hand concealed in his waistband, apparently clutching an object. He then suddenly pulled his right hand out of his waistband—a movement uniformly described by those on the scene as being similar to that of drawing a gun. At that point, the troopers were justified in opening fire. "An officer is not constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against a fleeing suspect who . . . moves as though to draw a gun." *Thompson*, 257 F.3d at 899. Waiting in such circumstances could well prove fatal. Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution. *See also Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993) (shooting was reasonable where, during a foot

12

chase of an armed assault suspect, the suspect suddenly reached into his waistband despite having been ordered to freeze); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (shooting was reasonable where officers approached the vehicle of a robbery suspect and, after being ordered to show his hands, the suspect reached under his seat multiple times).

To be sure, the plaintiff's brief suggests that Quick was simply complying with the order that he show his hands when he pulled his hand out of his waistband. *See* Pl.'s Br. at 10. But, as the plaintiff seemed to acknowledge at oral argument, the undisputed evidence shows that Quick pulled his hand out of his waistband, not as if he were surrendering, but abruptly and as though he were drawing a pistol. Given the state of the record, we are compelled to hold that the troopers reasonably believed that Quick was drawing a gun, not complying with their command that he show his hands.

B

The plaintiff argues that there is a triable issue on whether the troopers' continued use of force, even if initially justified, became excessive as the events unfolded. We agree. Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished. *See Lytle v. Bexar County, Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) (observing that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Waterman v.*

13

*Batton*, 393 F.3d 471, 481 (4th Cir. 2004) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); *Abraham*, 183 F.3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

Here, the troopers opened fire as Quick yanked his right hand out of his waistband. At that point, the troopers reasonably believed that Quick was pulling a gun on them. But after Quick made this sudden movement, his right hand was visible to the troopers, who were standing between five and eight feet away and had their flashlights trained on him. (Indeed, Modarelli has stated that he could see Quick's right hand while firing his weapon.) Although Quick's weaponless right hand was fully visible immediately after the troopers began firing, the troopers continued to fire for roughly 10 seconds, shooting a total of 39 rounds. On these facts, a reasonable jury could conclude that the troopers should have recognized that Quick was unarmed and stopped firing sooner.

We have not overlooked the fact that, just as the troopers began firing, Carson's flashlight was struck by a projectile, causing him to fall to the ground. We assume that the troopers could reasonably have believed that the flashlight was hit by return fire, thus justifying the further use of deadly force. But the evidence shows that the flashlight was hit as

14

the first shots were fired. In our view, a jury could find that the troopers should have realized that Quick did not have a weapon some time thereafter and ceased fire.

We are, moreover, concerned by the fact that 11 of the 18 bullets that struck Quick hit him from behind. The troopers try to explain this by saying that Quick spun around and fell to the ground as the final shots were fired. Frankly, this explanation sounds a bit far-fetched. If the troopers' account were accurate, one might expect to discover that a small number of bullets hit Quick from behind. In fact, more than half of the 18 bullets that struck Quick hit him from behind. In these circumstances, a jury may find that the troopers improperly continued firing after Quick had turned away from them and no longer posed a threat. *See Bing v. City of Whitehall*, 456 F.3d 555, 571–72 (6th Cir. 2006); *Carr v. Castle*, 337 F.3d 1221, 1227–28 (10th Cir. 2003); *Gardner v. Buerger*, 82 F.3d 248, 253–54 (8th Cir. 1996); *Ellis*, 999 F.2d at 247; *Samples v. City of Atlanta*, 846 F.2d 1328, 1332–33 (11th Cir. 1988).[2]

Having determined that a jury could find that the troopers' use of force reached excessive proportions, we now move to the second qualified immunity question: whether the right at issue was clearly established. *See Saucier*, 533 U.S. at 201. We conclude that it was. As explained, the evidence

---

[2] On the current record, the timing of the fatal shots is unknown, so the troopers have not suggested that Quick had already died by the time any excessive shots were fired.

15

would permit the conclusion that the troopers continued firing at Quick after a reasonable officer would have realized that he did not pose a serious threat and stopped shooting.  Assuming (as we must) that this view of the evidence is the one that ultimately will prevail, the troopers clearly are not entitled to qualified immunity.  It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others.  *Garner*, 471 U.S. at 3, 11; *Abraham*, 183 F.3d at 294.  In short, the dispute in this case is about the facts, not the law.  The doctrine of qualified immunity is therefore inapposite.  *See Saucier*, 533 U.S. at 205 (qualified immunity excuses reasonable "mistake[s] as to what the law requires").

C

Finally, the plaintiff argues that the troopers' decision to pursue Quick into the woods violated standard police procedures and was unreasonable.  According to a police expert retained by the plaintiff, the troopers should have set up a perimeter around the woods and used a K-9 to flush Quick out.  If the decision to enter the woods was unreasonable, the plaintiff reasons, then any force employed once in the woods was necessarily unreasonable, too, because the force would not have been used had the troopers not gone into the woods.  We reject this argument, as it is premised on a flawed understanding of the doctrine of proximate causation.

Like a tort plaintiff, a § 1983 plaintiff must establish

16

both causation in fact and proximate causation. *See Brower*, 489 U.S. at 599; *Martinez v. California*, 444 U.S. 277, 285 (1980); *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000); *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928). A superseding cause breaks the chain of proximate causation. *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1993); *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997) (noting that "in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability"); *Hector v. Watt*, 235 F.3d 154, 163 (3d Cir. 2000) (Nygaard, J., concurring) (observing, in a § 1983 case, that the "causal chain traced by a proximate cause analysis can be broken by a . . . superseding cause"); *see generally* Restatement (Second) of Torts §§ 440–453 (1965).

In *Bodine*, for example, police officers entered the plaintiff's home to arrest him. According to the officers, the plaintiff reacted violently, thus requiring them to use force to effect the arrest. 72 F.3d at 395. The district court held that the officers' entry into the plaintiff's home was unreasonable and violated the Fourth Amendment. Having so concluded, the court held that any force used once in the home, even if ostensibly justified, was necessarily unreasonable. *Id.* at 395–96. We disagreed with this analysis, explaining that it misapplied the doctrines of proximate and superseding causation. To illustrate, then-Judge Alito offered the following hypothetical, which is instructive here:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and

17

that they [enter illegally.] Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry . . . rendered any subsequent use of force unlawful? The obvious answer is "no." . . . . The suspect's conduct would constitute a "superseding" cause . . . that would limit the officer's liability.

*Id.* at 400. In other words, as long as "the officer['s] use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be a [superseding] cause that limited the officer['s] liability." *Hector*, 235 F.3d at 160 (describing *Bodine*); *see also Brower*, 489 U.S. at 599; *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1352–53 (5th Cir. 1985). *But see Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 538–39 (9th Cir. 2010).

The D.C. Circuit engaged in a similar analysis in *Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007). There, an off-duty police officer observed two people having sex inside a parked car. The officer tapped on the window of the car as he walked past. Irritated, the driver

18

attempted to run the officer over. The officer jumped out of the way, drew his gun, and ordered the occupants out. Once outside, the driver made a threatening movement towards the officer, whereupon the officer shot and killed him. 494 F.3d at 1099–1100. In the ensuing civil suit, the plaintiff advanced the theory that, if the officer had acted unreasonably in initiating the encounter, the officer was necessarily liable for the shooting, regardless of whether it was done in self-defense. The D.C. Circuit rejected this theory, holding that the suspect's threatening movement was a superseding cause that broke the causal chain between the initial stop and the shooting. *Id.* at 1104–05 & n.5.

Based on *Bodine* and *Hundley*, we conclude that the troopers' decision to enter the woods did not proximately cause Quick's death. Rather, Quick's noncompliant, threatening conduct in the woods was a superseding cause that served to break the chain of causation between the entry and the shooting. Holding otherwise would, as noted in *Hundley*, tend to deter police officers "from approaching and detaining potentially violent suspects." 494 F.3d at 1105.

## VI

The District Court correctly determined that the troopers' initial use of deadly force was permissible. But the Court erred in ruling for the troopers on the plaintiff's claim that the force became excessive as the events transpired. It may be that the troopers were justified in their use of force at all times, but it will be up to a jury to make that decision. The District Court's judgment will be affirmed in part and

19

reversed in part, and the case will be remanded for further proceedings.