NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0076n.06

No. 18-5047; 18-5110

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JOEL D. NASELROAD,

     Plaintiff-Appellant/Cross-Appellee,

v.

DENNIS MABRY,

     Defendant-Appellee,

MARK CRAYCRAFT,

     Defendant-Appellee/Cross Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Feb 14, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

BEFORE: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge**. Joel Naselroad was shot by a Kentucky State Police detective less than a minute after officers commenced a "knock and talk" operation at Naselroad's residence concerning a reported marijuana grow. Detective Mark Craycraft saw Naselroad leaving the house through the back door while he was standing at the front door of Naselroad's home speaking with Naselroad's mother. Suspecting that he was attempting to flee, perhaps to destroy evidence, Craycraft ran around the house to stop him. Detective Dennis Mabry, alerted by Craycraft's yelling "He's going out the back," also ran to the backyard, but via the other side of the house. Once Naselroad came into view behind the house, the detectives saw that Naselroad was holding a gun. After Naselroad failed to comply with commands to drop the gun, Mabry fired a single shot that struck Naselroad in the chest. Both Craycraft and Mabry were

dressed in plainclothes, and, according to Naselroad, they did not identify themselves as police before Mabry shot him. Naselroad survived the incident and sued Craycraft and Mabry, among other defendants, under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from unreasonable searches and excessive force, and raising as well a number of state law claims. The district court entered summary judgment in favor of defendants, finding that Craycraft and Mabry's actions were protected by qualified immunity.

We begin with a brief summary of the tangled history of this case. Following Naselroad's shooting, Kentucky officers obtained a search warrant for the Naselroad property. A search revealed marijuana and drug paraphernalia. Naselroad was indicted by a state grand jury on three counts of wanton endangerment, and counts of cultivation of marijuana, possession of marijuana, and possession of drug paraphernalia. He was ultimately convicted of possessing marijuana and drug paraphernalia, but acquitted of the other charges. In October 2014, Naselroad filed a complaint in federal court naming as defendants—in both their individual and official capacities— all four of the officers who participated in the "knock and talk" at his residence. He also sued their employers, the Clark County Sheriff, Kentucky State Police, City of Paris, and Clark County. The district court dismissed the claims against the Kentucky State Police and the officers in their official capacities on sovereign immunity grounds, and granted Naselroad leave to file an amended complaint against Craycraft, Mabry, and two other officers, in their personal capacities, along with the Clark County Sheriff in his official capacity, Clark County, and the City of Paris. After discovery, the district court granted defendants' motions for summary judgment and dismissed all of Naselroad's remaining claims.

Naselroad appealed the district court's dismissal of his § 1983 and state law claims against Craycraft and Mabry. A panel of this court issued an opinion remanding the case to the district court to determine whether *Heck v. Humphrey*, 512 U.S. 477 (1994) bars Naselroad's § 1983 claims. *Naselroad v. Mabry*, 686 F. App'x 312, 313-14 (6th Cir. 2017). After receiving briefing from the parties on the *Heck* question, as well as revived motions for summary judgment, the district court entered an order granting summary judgment to the defendants on all of Naselroad's claims.

Naselroad now appeals only the district court's order granting summary judgment to defendants Mabry and Craycraft. Craycraft cross appeals the district court's conclusion that *Heck* does not bar Naselroad's suit.

Naselroad's appeal and Craycraft's cross appeal raise the following questions:

1.  Did the district court err in holding that *Heck v. Humphrey* presents no bar to Naselroad's § 1983 suit against Craycraft?

2.  Did the district court err in holding that Mabry and Craycraft are sheltered by qualified immunity from Naselroad's claim that they violated his Fourth Amendment right against unreasonable searches?

3.  Did the district court err in holding that Mabry is immune from Naselroad's claim that Mabry violated his Fourth Amendment right against excessive force when Mabry shot him?

4.  Did the district court err in dismissing Naselroad's state law claims?[1]

We affirm in part and reverse in part. We affirm the district court's order holding that *Heck* does not bar Naselroad's § 1983 claims. We also affirm the district court's determination that

---

[1] In addition to these claims, Naselroad argues that the district court was foreclosed from reentering its order granting summary judgment to the defendants because the dispositional mandate of the prior appellate panel "reverse[d] the district court's order" rather than "vacated" it. Nothing in the prior panel's opinion, however, reflects an evaluation of the district court's summary judgment order *on the merits*. Naselroad cites no case law precluding a district court from again ordering summary judgment under these circumstances. On the contrary, we held in *Westside Mothers v. Olszewski* that the trial court was required to "implement both the letter and the spirit of the appellate court's mandate, taking into account the appellate court's opinion and the circumstances it embraces." 454 F.3d 532, 538 (6th Cir. 2006) (citation and internal quotation marks omitted). The district court here did precisely that by considering the issue the appellate court asked it to examine before again granting summary judgment.

Mabry and Craycraft are entitled to qualified immunity with respect to Naselroad's Fourth Amendment unreasonable search claims. We reverse the district court's order granting summary judgment on qualified immunity grounds to Mabry on Naselroad's Fourth Amendment excessive force claim, and remand for further proceedings on that claim; and we remand for reconsideration of Naselroad's state law assault and battery claim against Mabry. Lastly, because of a change in Kentucky law that occurred after the district court granted summary judgement, we remand for the district court's reconsideration of its order granting summary judgment to both defendants on Naselroad's state law malicious prosecution claim.

## I.

Because in granting summary judgment the district court was required to draw all reasonable factual inferences in favor of Joel Naselroad ("Naselroad"), Fed. R. Civ. P. 56(a), we present Naselroad's version of the facts, except where otherwise noted.

On October 7, 2013, Eric Miller was hunting deer on the property of Betsey and Larry Spengler in Winchester, Kentucky. Using a bow and arrow, he shot a deer that then escaped onto the neighboring Naselroad property. He searched for the deer but to no avail. During his search for the deer on the Naselroad property, however, Miller came upon what he believed to be marijuana plants. He returned home and told the Spenglers what he had seen. Betsey Spengler then called the police to report the marijuana grow. Craycraft called her back for more detail about the marijuana grow and told her he would look into it.

Craycraft coordinated with three other officers, including Mabry, in a Walmart parking lot near the Naselroad residence. The plan was to engage in a "knock and talk"[2] at the Naselroad

---

[2] As described by Mabry, a "knock and talk" is an inquiry made at a home where the officers "[c]an't stay any longer than what would have been a normal person knocking on the door." If the person answering the door refuses to consent, the officer must leave.

residence in hopes of getting permission to search for the marijuana plants. The four officers departed for the Naselroad residence in three vehicles, one marked as a Clark County Sheriff's Department vehicle, the other two unmarked. The officers had no warrant to search the Naselroad residence.

According to the officers, when they arrived at the Naselroad residence, Craycraft and another officer approached the front door while Mabry stood back by a vehicle putting on boots in preparation for a marijuana pull. Craycraft knocked on the door and Jeannie Naselroad, Joel Naselroad's mother, answered the door. After introducing himself and the officer with him as police, Craycraft explained that they were there based on a report of a marijuana grow on her property. She responded that she did not believe marijuana could be growing on her property. Craycraft claims that as she spoke he saw a person inside the house going toward a door that exits out of the back of the house. Craycraft claims that he called into the house "Hey buddy, I need to talk to you. State police." When the person, later identified as Naselroad, did not respond, Craycraft claims he left the porch, running through a breezeway adjacent to the house that opened into the backyard. As he ran he yelled to the other officers: "He's going out the back." Craycraft testified that as he approached the backyard he saw that Naselroad had a gun in his right hand. Craycraft claims he yelled "Gun. Gun. Gun." while drawing his firearm. Naselroad retreated up an incline in the backyard as Craycraft repeatedly told him to drop his gun. Craycraft had not yet entered the backyard when Mabry, whom Craycraft could not see from his position, shot Naselroad in the chest.

Mabry heard Craycraft yell "He's running out the back door" and then saw Craycraft go around the side and back of the Naselroad home. He did not know what Craycraft had seen, but claims that he thought whoever was running out the back door might be attempting to destroy

evidence of the marijuana grow. Mabry made his way to the backyard around the other side of the Naselroad home and heard Craycraft yell "Gun, gun, he's got a gun," at which point Mabry drew his weapon. As he came around the corner of the home into the backyard, Mabry saw Naselroad with a gun, retreating from the house. Mabry trained his gun on Naselroad. Naselroad looked over in Mabry's direction after hearing Mabry repeatedly yell "drop the gun." But Naselroad did not drop his gun, and Mabry then shot him. All told, only about 15 seconds passed between the time that Naselroad exited the rear door and Mabry fired his weapon.

Both Mabry and Craycraft were in plainclothes that day—Mabry wore jeans and a t-shirt with a badge on his waistband; Craycraft wore jeans and a long-sleeve shirt with no visible badge. Both officers observed Naselroad retreating from them. Prior to the shooting, Naselroad did not advance toward the officers and did not say anything to them. Naselroad claims he did not hear the officers identify themselves as police, but instead heard only "hey you, buddy" followed by demands that he drop his gun. Naselroad claims that the gun he was holding was in a "low ready" position throughout his encounter with Mabry and Craycraft, and that he never pointed the gun at either officer.

Naselroad's account of why he was departing from the backdoor that morning differs dramatically from the officers' suspicions. He claims that he did not leave the house to destroy evidence; in fact, he claims he did not even know the police were present at the house. Earlier that morning, Naselroad reviewed images from a trail camera showing an unknown masked man walking on the Naselroad property (in fact what he saw were images of the deer-hunting, marijuana-discovering Eric Miller). Alarmed by the images, Naselroad claims he told his mother about the man on the property, changed into camouflage clothing, and exited the rear door, carrying his gun. Naselroad claims that when he was confronted by Craycraft, and then moments later by

Mabry, he was confused about what was going on and did not realize the men in his backyard were police officers.

Lieutenant Jeremy Hamm ("Hamm") of the Kentucky State Police received a call that morning advising him of an officer-involved shooting. By the time he arrived at the scene of the shooting, Naselroad had been transported to the hospital. Hamm was in charge of processing the scene and obtaining a search warrant. He took possession of the gun Naselroad had held as well as the gun Mabry used to shoot Naselroad.

Hamm collected additional information from the scene and then presented an application to a Clark County district judge, who issued a search warrant that afternoon. Hamm executed the warrant at the Naselroad residence, seizing marijuana and pipes, which were collected as evidence and later used as the basis of Naselroad's state convictions.

Having addressed the lengthy history of this case, we turn to the merits.

## II.

### A.

*Heck* bars Naselroad's § 1983 suit if a judgment in his favor would necessarily imply the invalidity of his state convictions for possessing drugs and drug paraphernalia. 512 U.S. at 487. If *Heck* applies, then Naselroad must successfully challenge the validity of his state convictions before bringing suit under § 1983. *Id.*

Craycraft argues that *Heck* bars Naselroad's § 1983 claims because Naselroad's state convictions relied exclusively on evidence ultimately obtained as a result of what Naselroad maintains was an unconstitutional entry onto the Naselroad property. If Naselroad succeeds in his claim, and no legal doctrine would nonetheless save the evidence from exclusion, then the evidence undergirding his state convictions should have been suppressed. Consequently, Naselroad's

success here would necessarily imply that his state convictions were based on improper evidence. *See Harper v. Jackson*, 293 F. App'x 389, 392 (6th Cir. 2008).

The district court rejected this argument on the grounds that a legal doctrine exists which would have kept the evidence from being suppressed—the good-faith exception to suppression established by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 920-23 (1984). The *Leon* good-faith exception applies to evidence obtained by an officer who conducted a search in reasonable reliance upon a search warrant (later found to be defective) that was issued by a neutral and detached magistrate. *Id*.

Craycraft argues that the district court was wrong to conclude that *Leon* applies because the actions of the officer—Lieutenant Hamm—who applied for the search warrant and conducted the search fall outside the ambit of *Leon*'s good-faith exception. First, Craycraft argues that Hamm's search warrant application misled the magistrate with information that Hamm knew or should have known to be false. We are not persuaded. Craycraft does not show that Hamm concealed information he knew, or recklessly disregarded information he should have known, in his warrant application. As the district court stated, "[t]here is no evidence that Hamm had any reason to believe that constitutional violations had taken place." In this appeal, Craycraft points to no additional evidence contradicting the district court's conclusion.

Second, Craycraft argues that the good-faith exception would not apply because the warrant was facially deficient. Craycraft points out that Hamm's affidavit applying for the warrant failed to provide a description of several features of the residence, such as the breezeway and the root cellar, preventing the magistrate from evaluating the constitutionality of the officers' initial entry onto the Naselroad property. But the affidavit accurately indicates that the officers pursued and seized Naselroad in the rear of the Naselroad residence:

> While talking with a female at the [Naselroad] residence, one of the task force members, Mark Craycraft, observed a white male, dressed in camouflage, exit the residence toward the rear of the property. Contact with the suspect was attempted to be made by the officers at which time, the suspect, later identified as Joel Naselroad, pulled a handgun from the holster, inserted a bullet into the chamber through a process known as "racking" and pointed the loaded gun at the officers consisting of undercover and uniformed officers.

While the affidavit does not recount details about the exact scope of the driveway, breezeway, and backyard, it is not a bare-bones description that enters the realm of facial deficiency. We have previously held, under similar circumstances, that the *Leon* good-faith exception applied. *See United States v. McClain*, 444 F.3d 556, 565-66 (6th Cir. 2005).

*Heck* does not bar Naselroad's § 1983 claims against Craycraft and Mabry.

**B.**

We review de novo the district court's order granting summary judgment to Craycraft and Mabry. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must "view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001).

The district court granted Craycraft and Mabry summary judgment on the grounds that they were immune from Naselroad's suit. Though the text of § 1983 makes no mention of immunity for government officials, our courts have long held that officials sued under § 1983 are entitled to raise the defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). This judicially established immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818). "The purpose of the 'clearly established' prong . . . is to ensure that officials are on notice that their alleged conduct was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015). Naselroad bears the burden of showing that Craycraft and Mabry are not entitled to qualified immunity. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (holding that "[q]ualified immunity is an affirmative defense that, once asserted, shifts the burden of proof to the plaintiff"). Summary judgment is not proper here if we find that Naselroad has shown that (1) "there are genuine issues of material fact as to whether the Officers violated the plaintiff's Fourth Amendment rights in an objectively unreasonable way" and that (2) "those rights were clearly established at the time of the plaintiff's arrest such that a reasonable officer would have known that his conduct violated them." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (internal quotation marks, alterations and citation omitted).

*Warrantless search*. At the outset we note that there is some dispute over whether the officers' initial entry to confront Naselroad occurred on property protected by the Fourth Amendment—that is, the curtilage of the Naselroad home. We need not resolve this issue. Even assuming Mabry and Craycraft entered the curtilage of Naselroad's family home, we find that both officers deserve qualified immunity from Naselroad's claim that they violated his Fourth Amendment right to be free from unreasonable searches.

While warrantless searches of a person's home (including the curtilage) are presumptively unreasonable, we recognize four exigent circumstances in which such searches are reasonable: (1) pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) preventing a suspect's escape; and (4) a risk of danger to police or others. *See e.g.*, *Taylor v. Mich. Dep't of Nat. Res.*, 502 F.3d 452, 461 (6th Cir. 2007). To justify a warrantless search under any of these exceptions

to the warrant requirement, there must be probable cause to search the home in addition to the exigency. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 n.6 (6th Cir. 1988). An officer remains entitled to qualified immunity for determinations of probable cause and the existence of an exigency that were ultimately incorrect, but still reasonable. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002); *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993) (holding that "probable cause determinations, even if wrong, are not actionable as long as such determinations pass the reasonableness test"). The reasonableness of the officers' probable cause and exigency determinations, in turn, are "a question of law to be decided by the trial judge," *id.*, and are to be determined in light of "information the arresting officers possessed" at the time, *see Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (alteration omitted).

Craycraft and Mabry reasonably determined that there was probable cause to believe that they would find evidence of a crime and that the destruction of evidence was imminent if they did not confront Naselroad as he departed from the back of his house. They are therefore entitled to qualified immunity. Viewed from the perspective of Craycraft, it was reasonable to think that Naselroad was leaving the house in response to the arrival of police. A reasonable officer in Craycraft's position would have known that one of the police vehicles that pulled up to the Naselroad residence was marked and the police identified themselves as such when Naselroad's mother answered the door. A reasonable officer would also have known that he was there to investigate a detailed tip by an identified neighbor that there were marijuana plants on the property. On the basis of that information, it would not be unreasonable for an officer to conclude, as Craycraft did, that Naselroad, exiting out of the rear of the house in camouflage, was doing so in response to the arrival of police and in order to destroy evidence of a marijuana grow. Evasive activity after contact with law enforcement conducting a "knock and talk" to investigate drugs can

support a reasonable inference that evidence is about to be destroyed. *See United States v. Hogan*, 539 F.3d 916, 922-23 (8th Cir. 2008). Because that determination was reasonable, Craycraft's decision to pursue Naselroad was also reasonable, and he is entitled to qualified immunity for that pursuit.

Naselroad argues that it was unreasonable for Craycraft to assume that he was exiting the house in response to the presence of police, and he complains that the district court failed to draw all inferences from the record in his favor. True enough, the district court's opinion credits a statement made by Jeannie Naselroad in a police interview that Joel Naselroad was still in the house when the police arrived even though that statement may not be admissible as substantive evidence. But there is no genuine dispute that Craycraft saw Naselroad exiting the back of the home at approximately the time that the officers arrived, and there is no genuine dispute that one of the officers was uniformed and one of the police cars was marked. On this record it was not unreasonable for Craycraft to conclude that Naselroad was acting in an evasive manner.

With respect to Mabry, the district court correctly found that it was not unreasonable for Mabry to conclude that the "imminent destruction of evidence" exigency justified his entry into Naselroad's curtilage. The same analysis that applied to Craycraft applies to Mabry. The only—ultimately immaterial—difference is that Mabry sprang into action not after seeing Naselroad exit the home, but after hearing Craycraft yell that "He's running out the back door."

Again, we need not and do not decide whether Craycraft or Mabry actually had probable cause to believe that they would find evidence of a crime and whether that evidence was at risk of imminent destruction. We decide only that Naselroad has not met his burden of showing that Craycraft and Mabry were unreasonable in coming to those conclusions.

*Excessive force*.  "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  We decide whether Mabry's use of deadly force was reasonable, under the totality of the circumstances, by "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Bletz v. Gribble*, 641 F.3d 743, 750-51 (6th Cir. 2011) (citations and internal quotation marks omitted).  This is an objective analysis done "without regard to [Mabry's] underlying intent or motive."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Three factors guide our analysis of the objective reasonableness of Mabry's decision to shoot Naselroad: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or others' safety; and (3) whether the suspect actively resisted arrest or attempted to flee.  *Id*. at 396.

The district court held that Mabry was entitled to qualified immunity from Naselroad's excessive force claim, reasoning that "[w]hile the crime at issue was not severe or necessarily violent, the other two factors outweigh the effect of that factor."

We find that, viewing the record in the light most favorable to Naselroad, summary judgment on grounds of qualified immunity is inappropriate.  This is so because, first, Naselroad enjoyed a clearly established right not to be shot if he did not present a threat sufficient to justify the use of deadly force.  *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) ("It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." (citation and internal quotation marks omitted) (collecting cases).  Second, on Naselroad's rendition of the facts, a reasonable juror could conclude that Mabry's use of deadly force was excessive in light of the threat Naselroad presented.  *See Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) ("[T]he jury becomes the final

arbiter of [Mabry's] claim of immunity . . . [when] the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.").

This conclusion squares with our prior decisions. *See King*, 694 F.3d at 662-63 (holding that the presence of a genuine dispute as to whether King was pointing a gun at the officers who shot him created "a question for the jury" because a jury could find that "King did not point a gun towards the officers just before he was shot"); *see also Bletz*, 641 F.3d at 750-53 (denying qualified immunity to officers who used deadly force on a plaintiff because jurors could conclude that even though the plaintiff held a gun, he appeared to be complying with police commands); *Brandenburg*, 882 F.2d at 215 ("Though [the officer] claims that Mr. Brandenburg had pointed his weapon 'directly at us,' presumably proving that he or any officer would have a subjective belief in a threat of serious physical harm, there are facts which might indicate otherwise."). A jury crediting Naselroad's account could conclude that his gun was always pointed at the ground, never directly at an officer, and that Naselroad did not indicate, verbally or physically, an intention to harm the officers. Such a jury could conclude that Mabry lacked probable cause to believe Naselroad presented an immediate threat to officer safety.[3] It may matter to the jury, as well, that the officers were at the property to investigate a non-violent, low-level crime and had no additional information to suggest that Naselroad was threatening.

---

[3] There is some ambiguity in the record about what exactly Naselroad conceded during his deposition testimony regarding where his gun was pointed. He testified that he held his gun in the "low ready" position in the general direction of Craycraft, whom Mabry could not see from his vantage point, and, in response to Mabry's arrival, turned toward Mabry with his gun still pointed down. On this record, we cannot determine, as a jury would be able to, whether by "low ready" Naselroad means that he held the gun pointing at the ground near his feet or at the feet of Craycraft, for instance. The difference between the two could well be a relevant factor for a jury determining whether Mabry had probable cause to believe that Naselroad presented a serious threat of harm. *See Brandenburg*, 882 F.2d at 215 (holding that the question of whether a gun was pointed at an officer was a relevant question for a jury determination of excessive force).

The fact that Naselroad testified that his gun was pointed down is not dispositive, of course. We take each case on the totality of its own facts. "[A]n armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat. Pursuant to *Tennessee v. Garner* and its progeny, there are many circumstances under which a police officer could reasonably feel threatened." *Cooper v. Sheehan*, 735 F.3d 153, 159 n.9 (4th Cir. 2013).

Mabry cites several out-of-circuit appellate and district court cases as persuasive precedent in support of the proposition that deadly force is constitutionally reasonable "when a suspect draws, or merely appears to attempt to draw, a weapon against police." None of the cases Mabry cites stands for so broad a claim and all are, moreover, fundamentally distinguishable from the facts of this case.[4]

## C.

*Kentucky assault and battery*. The district court also granted summary judgment to Mabry on Naselroad's Kentucky assault and battery claim, relying on the same analysis that undergirded its conclusion that Mabry was entitled to summary judgment on Naselroad's § 1983 excessive

---

[4] Mabry cites to *Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011). There, police opened fire on a man who was suspected of stealing a car and who had fled police, ditched a car, and run into a dense forest. *Id*. at 179-80. Police pursued him into the forest (to make matters worse, this pursuit occurred at night). *Id*. When the police eventually found him hiding in the brush, he refused to comply with their commands, and then made a sudden movement pulling what appeared to be a gun out of his pocket. Police shot and killed him. *Id*. Two facts distinguish that case from the present one. There was a sudden upward movement of the man's hand, such that it appeared he was drawing a gun. There was also the fact that he was in flight from police. His flight increased the risk to police.

Mabry also cites to *Thompson v. Hubbard*, 257 F.3d 896, 898-99 (8th Cir. 2001), where police, responding to a reported armed robbery where shots had been fired, pursued a suspect through an alleyway and shot him when he appeared to pull a gun from his waistband after the officer yelled for him to stop. Unlike this case, shots had been fired, the crime involved was inherently violent, the suspect was fleeing from police, and he was making, as in *Lamont*, a movement in defiance of police orders toward what appeared to be a gun in his waistband.

Mabry cites to *Elliot v. Leavitt*, 99 F.3d 640, 641-42 (4th Cir. 1996), where a motorist, handcuffed and detained in a police car, pulled a small gun out of his pocket and pointed it at police officers. The motorist ignored an officer's command to drop the gun, persisted in pointing the gun at the officers, and the officers opened fire. *Id*. Unlike this case, the act of pulling a weapon out while detained inside a police car plainly indicates an intent to use the gun to shoot the police and escape.

Mabry also cites to *Fortunati v. Campagne*, 681 F.Supp.2d 528 (D. Vt. 2009). There, a SWAT unit was called up to help bring a schizophrenic man into custody after he had threatened a family member with a gun. *Id*. at 531-32. Police surrounded him and attempted to gain his compliance but he evaded them, eventually getting a gun. *Id*. at 533-34. The man hid behind a tree, moving erratically while police repeatedly ordered him to show his hands and move from behind the trees. *Id*. After being hit by a beanbag round, he turned toward the officer who shot him and made "a rapid motion toward his gun, evincing an intent or readiness to use the gun." *Id*. at 537. These circumstances are unlike what Mabry encountered. The mental instability of the man, his prior threats to a family member, and the rapid movement he made toward his gun—all of these facts distinguish this case from Naselroad's actions.

Last, Mabry cites to *Britt v. Raymes*, an unpublished district court opinion. 2013 WL 1091047 (E.D. N.C. 2013). That case concerned actions taken while officers executed a search warrant on the home of a major trafficker of cocaine, known to have multiple firearms and aggressive dogs at the property. *Id*. at *1-*2. The district court, based on extensive expert witness testimony, concluded that no reasonable juror would accept the plaintiff's version of the facts, and on that basis granted summary judgment to the officer who shot the plaintiff. *Id*. at *7. The district court here did not dismiss Naselroad's version of events.

force claim. Because of its reliance on that analysis, which we rejected above, we vacate the district court's order and remand the matter for the district court's reconsideration. We offer no opinion on the merits of that claim under Kentucky qualified immunity law.

*Kentucky malicious prosecution.* Naselroad also appeals the district court's summary judgment in favor of Mabry and Craycraft with respect to his state law malicious prosecution claim. Pointing out that Naselroad did not challenge the district court's judgment on this issue in his first appeal, Mabry and Craycraft argue that Naselroad has forfeited this claim. Our case law "bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997). But there is an exception to that rule if there is "an intervening change of controlling law." *Amen v. Dearborn*, 718 F.2d 789, 794 (6th Cir. 1983). That exception applies here. Five months after the district court issued its opinion granting summary judgment to the defendants on Naselroad's malicious prosecution claim, the Kentucky Supreme Court published *Martin v. O'Daniel*, 507 S.W.3d 1, 7-12 (Ky. 2016), which abrogated the case principally relied upon by the district court in its malicious prosecution analysis, *Raine v. Drasin*, 621 S.W.2d 895 (Ky. 1981). We therefore vacate the district court's order granting summary judgment for the defendants on this claim and remand for reconsideration in light of *Martin v. O'Daniel*.

### III.

For the foregoing reasons we **AFFIRM** the judgment of the district court granting Mabry and Craycraft's motions for summary judgment on Naselroad's Fourth Amendment unlawful search claims; we **REVERSE** the judgment of the district court granting qualified immunity to Mabry on Naselroad's Fourth Amendment excessive force claim; and we **VACATE** the district court's order on the state law assault and battery claim against Mabry as well as the state law

malicious prosecution claims against Mabry and Craycraft.  We **REMAND** for further proceedings consistent with this opinion.