SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Bryheim Jamar Baskin v. Rafael Martinez (A-70-18) (081982)**

**Argued January 7, 2020 -- Decided July 9, 2020**

**ALBIN, J., writing for the Court.**

In this Section 1983 civil rights lawsuit, the Court considers whether defendant Detective Rafael Martinez, who chased and eventually shot plaintiff Bryheim Jamar Baskin, is entitled to qualified immunity and therefore dismissal of the lawsuit on summary judgment.

Baskin alleges the shooting constituted excessive force in violation of his federal constitutional rights. At the completion of discovery, Detective Martinez moved for summary judgment, asserting that his use of deadly force, under all the circumstances, was objectively reasonable, and therefore he was entitled to qualified immunity.

Certain facts are essentially undisputed. In the afternoon of September 11, 2012, Detective Martinez and other officers were on patrol in an area in Camden known for significant drug activity. When officers observed Baskin pull out of a parking lot without signaling, one unmarked patrol vehicle maneuvered in front of Baskin's car for the purpose of making a motor vehicle stop. To assist the stop, Detective Martinez, who was in uniform, positioned his unmarked vehicle behind Baskin's. Baskin suddenly put his car in reverse and collided into Martinez's vehicle. Baskin then fled on foot through a residential area with a handgun tucked in the waistband of his shorts as the officers pursued him, with Martinez yelling a number of times, "police, stop."

During the chase, Martinez saw Baskin drop the handgun, pick it up, and continue to run with the gun in his hand. At that point, Martinez slowed to unholster his weapon. Baskin ran into a walled-in backyard of a residence, where, out of Martinez's sight, he tossed the gun, which landed in the yard. Cornered, with no apparent means of escape, Baskin ended his flight. What occurred immediately afterward is the subject of dispute.

According to Baskin, when he realized he had nowhere to go, he placed his empty hands over his head and remained in that position as Detective Martinez rounded the corner. Baskin states that, despite keeping his open hands over his head and making no threatening gesture, Detective Martinez shot him in the abdomen. Cherron Johnson, an area resident, witnessed the events and corroborated Baskin's account.

1

Detective Martinez testified that, during the chase, he lost sight of Baskin, who he had last seen carrying a handgun. After carefully and slowly rounding the corner of a home until he gained a full view of the backyard, Martinez observed Baskin standing with his back facing the detective. Martinez stated that Baskin was turning around with his right arm extended straight in front of him, pointing toward Martinez a black object that he believed to be a gun. At that moment, Martinez explained, "I was in fear for my life, and I pulled the trigger and I hit him in the abdomen area."

Immediately afterward, several officers arrived at the scene and retrieved two cell phones near where Baskin fell. Elsewhere in the yard, the officers found a semiautomatic handgun, loaded with eleven hollow-point bullets. Baskin was taken by ambulance to a nearby hospital where he was treated for serious and permanent injuries.

The trial court afforded Detective Martinez qualified immunity and granted summary judgment in his favor. A split Appellate Division panel reversed. An appeal as of right was filed, based on the dissent in the Appellate Division.

**HELD:** For summary judgment purposes, the Court must accept as true the sworn deposition testimony of Baskin and the independent eyewitness, who both stated that Baskin's open and empty hands were above his head, in an act of surrender, when Detective Martinez fired the shot. Under that scenario, a police officer would not have had an objectively reasonable basis to use deadly force. The law prohibiting the use of deadly force against a non-threatening and surrendering suspect was clearly established, as evidenced by cases in jurisdictions that have addressed the issue. Thus, Detective Martinez was not entitled to qualified immunity on summary judgment.

1. Section 1983 provides a cause of action for the deprivation of any rights secured by law by any person acting under color of law. The Fourth Amendment guarantees every person the right to be free from "unreasonable" seizures, and the United States Supreme Court has held that the use of excessive force in the course of an arrest constitutes an unreasonable seizure under the Fourth Amendment. The ultimate issue in analyzing any excessive-use-of-force claim is whether, from the police officer's perspective, the use of force was objectively reasonable under all the circumstances. A police officer may only use deadly force against a suspect when the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others. (pp. 12-15)

2. The doctrine of qualified immunity generally protects government officials from civil liability for discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In determining whether qualified immunity applies in a particular case, a court ordinarily must address two issues: (1) whether the evidence, viewed in the light most favorable to the plaintiff, establishes that the official violated the plaintiff's constitutional or statutory rights, and (2) whether the right allegedly violated was "clearly established" at the time of the

2

officer's actions.  A right is "clearly established" if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  (pp. 15-17)

3.  For summary judgment purposes, the Court must accept as true the testimony of Baskin and Johnson that as Detective Martinez rounded the corner of the house, Baskin was standing with his open and empty hands above his head, signaling in a language universally understood his intent to surrender.  Numerous cases have made clear that it is not objectively reasonable to shoot a suspect after he has placed his empty hands over his head in an act of surrender.  The law is also clear that a suspect's conduct leading up to his attempt to surrender cannot alone justify shooting the suspect -- using deadly force against him -- when his hands are above his head in an act of submission and he no longer poses a threat.  Thus, an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. (pp. 17-22)

4.  In rendering a decision on qualified immunity, the Court does not sit as a trier of fact, weighing the evidence and making credibility determinations.  Rather, under the standards that govern its review, the Court must accept that Baskin had his empty hands above his head in a sign of surrender, made no threatening gestures, and no longer posed a threat.  Under that scenario, an objectively reasonable police officer would not have had a justification to use deadly force.  The two conflicting accounts of what occurred at the time of the shooting, and any other disputed issues of material fact, must be submitted to a jury for resolution.  After the jury makes its ultimate findings, the trial court can determine the merits of the application for qualified immunity.  (pp. 22-24)

**JUSTICE SOLOMON, dissenting**, notes that before Baskin was restrained, he threatened lives by speeding away from one police vehicle, crashing into another, and then fleeing the scene of the crash, in possession of a handgun, through a residential neighborhood.  Justice Solomon explains that, under the totality of the circumstances, a reasonable officer at the scene would have no reason to know, in the split second that Martinez fired his weapon, that Baskin no longer possessed a gun.  Justice Solomon concludes that, considering the alleged facts in a light most favorable to Baskin, Martinez's belief in the need to use deadly force to prevent Baskin's escape and protect against the threat of danger Baskin posed to Martinez and others was reasonable given the totality of the circumstances from the perspective of an officer on the scene.

**AFFIRMED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and TIMPONE join in JUSTICE ALBIN's opinion.  JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.**

3

Bryheim Jamar Baskin,

Plaintiff-Respondent,

v.

Rafael Martinez, City of Camden and
Scott Thompson,

Defendants-Appellants.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| January 7, 2020 | July 9, 2020 |

Timothy J. Galanaugh, Assistant City Attorney,
argued the cause for appellants (Michelle Banks-
Spearman, Camden City Attorney, attorney; Timothy
J. Galanaugh, on the briefs).

Paul R. Melletz argued the cause for respondent
(Gerstein, Grayson, Cohen & Melletz, attorneys; Paul
R. Melletz, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

In this Section 1983 civil rights lawsuit, plaintiff Bryheim Jamar Baskin

claims that a justifiable police chase ended in an unjustifiable police shooting

1

-- the use of excessive force in violation of the Federal Constitution. The issue before us is whether defendant Detective Rafael Martinez, who chased and eventually shot Baskin, is entitled to qualified immunity and therefore dismissal of the lawsuit on summary judgment.

On the summary judgment record before us, certain facts are undisputed. The police gave chase to twenty-year-old Baskin after he crashed his car into an unmarked patrol vehicle occupied by Detective Martinez. Baskin fled on foot armed with a handgun, which he discarded out of Martinez's sight. Then, Baskin found himself trapped in a walled yard with no way to escape. At this point, the accounts given by Baskin and a neighborhood eyewitness, on the one hand, and Detective Martinez, on the other, starkly diverge.

According to Baskin and the eyewitness, Baskin put his hands above his head and turned toward the pursuing police officer. His palms were open. He held no weapon in his hand. He made no gesture that he was reaching for a weapon and, at that moment, he posed no threat. Baskin and the eyewitness state that while Baskin's hands were in the air in a sign of surrender, Detective Martinez shot him in the abdomen, causing serious and permanent injuries.

In contrast, Detective Martinez asserts that when Baskin finally came into sight, Baskin turned and pointed in the detective's direction an object that looked like a gun. Only then, fearing for his life, says Detective Martinez, did

2

he discharge his weapon. Although no handgun was found where Baskin fell, two cell phones were located nearby.

Despite those disputed facts, the trial court granted Detective Martinez qualified immunity and dismissed Baskin's Section 1983 action. A split three-judge Appellate Division panel reversed and reinstated the case. Based on the dissent in the Appellate Division, the issue of whether Detective Martinez is entitled to qualified immunity comes to us on an appeal as of right. N.J. Const. art. VI, § 5, ¶ 1(b); R. 2:2-1(a)(2).

We now affirm the Appellate Division majority. At the summary judgment stage, in deciding the issue of qualified immunity, our jurisprudence requires that the evidence be viewed in the light most favorable to Baskin. Therefore, for summary judgment purposes, we must accept as true the sworn deposition testimony of Baskin and the independent eyewitness, who both stated that Baskin's hands were above his head, in an act of surrender, when Detective Martinez fired the shot. Under that scenario, a police officer would not have had an objectively reasonable basis to use deadly force. The law prohibiting the use of deadly force against a non-threatening and surrendering suspect was clearly established, as evidenced by cases in jurisdictions that have addressed the issue. Thus, Detective Martinez was not entitled to qualified immunity on summary judgment.

3

The disputed issues of material fact -- whether Detective Martínez's use of deadly force was objectively reasonable -- are for a jury to resolve, not for a court. Accordingly, we remand this matter for further proceedings consistent with this opinion.

## I.

## A.

In this action brought primarily under 42 U.S.C. § 1983, Baskin alleges that Detective Martinez shot him in the stomach while he was unarmed and in the act of "surrendering" -- "standing with his hands up in the air facing" the detective. In the complaint, Baskin claims that the shooting constituted excessive force in violation of his federal constitutional rights and names as defendants Detective Martinez, the Chief of Police of the Camden Police Department, and the City of Camden. The Section 1983 claim against the chief of police and the city is premised on their alleged failure to provide training and supervision on "the lawful use of an officer's service revolver."[1]

At the completion of discovery, Detective Martinez moved for summary judgment, asserting that his use of deadly force, under all the circumstances, was objectively reasonable, and therefore he was entitled to qualified immunity. Although in deciding the issue of qualified immunity on summary

---

[1] Baskin also asserted common law claims of assault, battery, and negligence.

judgment the evidence must be viewed in the light most favorable to Baskin, we present here a more fulsome account of the critical events based on the deposition testimony in the summary judgment record.

Certain facts are essentially undisputed. In the afternoon of September 11, 2012, Detective Martinez and other Camden police officers were on patrol in unmarked vehicles in an area in Camden known for significant drug activity. When officers observed Baskin pull out of a parking lot without signaling, one unmarked patrol vehicle maneuvered in front of Baskin's car for the purpose of making a motor vehicle stop. To assist the stop, Detective Martinez, who was in uniform, positioned his unmarked vehicle behind Baskin's. With unmarked police cars in front of and behind him, Baskin suddenly put his car in reverse and collided into Martinez's vehicle.[2] Baskin fled on foot with a handgun tucked in the waistband of his shorts as the officers pursued him, with Martinez yelling a number of times, "police, stop." Martinez followed close behind as Baskin raced through a residential area and leapt over several fences.

During the chase, Martinez saw Baskin drop the handgun, pick it up, and continue to run with the gun in his hand. At that point, Martinez slowed to unholster his weapon. Baskin eventually ran into a walled-in backyard of a

---

[2] In his deposition testimony, Baskin stated that the area where he was "cut off" by the unmarked vehicle is known for drug activity and shootings. He admitted to having drugs in his car.

5

residence, where, out of Martinez's sight, he tossed the gun, which landed in the rear of the yard. Cornered, with no apparent means of escape, Baskin ended his flight. What occurred immediately afterward is the subject of dispute.

According to Baskin, when he reached the walled-in backyard and realized he had nowhere to go, he placed his empty hands over his head and remained in that position as Detective Martinez rounded the corner of the house and saw "[him] with [his] hands in the air." Baskin believed that his raised hands signaled that he was surrendering, so he said nothing as Detective Martinez came into sight.[3] The only objects on his person were two cell phones in the pocket of his shorts. Baskin states that, despite keeping his open hands over his head and making no threatening gesture, Detective Martinez shot him in the abdomen, causing grievous and permanent injuries.

Cherron Johnson, an area resident, witnessed the events and corroborated Baskin's account of the last moments of the chase. In her deposition testimony, Johnson stated that she had just arrived home and had stepped out of her car and was talking with a friend when she saw Baskin

---

[3] During his deposition, Baskin was never asked a direct question whether he was facing Martinez when he was shot. In his Material Statement of Facts filed in response to the summary judgment motion, however, Baskin asserted that he "was standing with his hands up in the air facing [Detective] Martinez" when shot -- the same assertion made in his complaint. (emphasis added).

running with Detective Martinez in pursuit. She explained that when Baskin ran behind the house and reached the wall, he placed his empty hands in the air, and then Detective Martinez shot him. As Johnson described it, Baskin "put his hands up and he turned around. And when he turned around, . . . he just got shot." At one point in her deposition testimony, she stated that Baskin had completely turned around with his hands in the air when Martinez fired the shot,[4] and, at another point, she indicated that "it happened so fast, I'm not sure if he was in the middle of turning around. <u>I know his hands [were] in the air</u>, and you could see him turning around." (emphasis added). She added, "I really didn't think it was right what happened . . . . I just know that I don't think he should have shot the boy."

Detective Martinez gave a very different account from Baskin and Johnson. In his testimony, he explained that, during the chase, he lost sight of Baskin, whom he had last seen carrying a handgun. After carefully and slowly rounding the corner of a home until he gained a full view of the backyard, Martinez observed Baskin standing with his back facing the detective. Martinez stated that Baskin was turning around with his right arm extended straight in front of him, pointing toward Martinez a black object that he

---

[4] Johnson was asked, "Was he completely turned around and his hands were in the air and that's when he got shot?" She responded, "Right."

believed to be a gun.  At that moment, Martinez explained, "I was in fear for my life, and I pulled the trigger and I hit him in the abdomen area."

Immediately afterward, several officers arrived at the scene and retrieved two cell phones near where Baskin fell.  Elsewhere in the yard, the officers found a semiautomatic handgun, loaded with eleven hollow-point bullets.  Baskin was taken by ambulance to a nearby hospital where he was treated for serious and permanent injuries.[5]

## B.

Despite that conflicting testimony, the trial court afforded Detective Martinez qualified immunity and granted summary judgment in his favor, dismissing Baskin's Section 1983 action.[6]  The trial court highlighted Detective Martinez's likely perceptions during the chase.  Detective Martinez knew that he was pursuing a suspect with a gun and had a right "to protect himself against someone who was known to be armed."  In the court's view,

---

[5] The Camden County Prosecutor's Office investigated the shooting and concluded that Detective Martinez was justified in using deadly force because he "reasonably believed Bryheim Baskin's actions placed him in imminent danger of death or bodily injury."  Baskin pled guilty to four charges relating to the events of that day:  second-degree eluding, second-degree unlawful possession of a weapon, third-degree resisting arrest, and possession of less than half an ounce of cocaine with the intent to distribute.

[6] The trial court did not address Baskin's state law claims, but evidently those claims were dismissed as well.

even if it were to disregard Martinez's belief that Baskin had an object in his hand, "the fact that [Baskin], when confronted in that alley by the officer, turned towards the officer" entitled Detective Martinez to "qualified immunity." The court concluded that Martinez had an objectively reasonable basis for using deadly force under those circumstances. The court commented, "[w]hat Baskin didn't do was get on the ground, be passive, or anything of that nature." In its final summary judgment assessment, the court hardly acknowledged the testimony of Baskin and Johnson that Baskin's hands were over his head when he was shot.

## C.

A split Appellate Division panel reversed in an unpublished opinion. The two-judge majority noted that qualified immunity ordinarily is a question of law to be decided by the court, after viewing the facts in the light most favorable to the plaintiff. The panel majority added, however, that disputed issues of material fact must be resolved by the jury. The majority faulted the trial court for "improperly weigh[ing] the eyewitness' observations." In its view, Baskin's and Martinez's accounts about "what occurred in the moments just before [Baskin] was shot differ[ed] in material respects."

The majority observed that although Detective Martinez stated that he shot Baskin because Baskin was pointing at him what appeared to be a gun, the

trial court accepted that Martinez's use of deadly force would have been justified even if Baskin had no weapon in his hand -- and even if Baskin's hands were raised over his head. According to the majority, whether Baskin pointed an object at Detective Martinez or whether Baskin put his empty hands over his head were "significantly material" facts in dispute that bore on any determination of the objective reasonableness of Martinez's actions and his entitlement to qualified immunity. The majority did not suggest that those were necessarily the only material facts in dispute, emphasizing that the jury would decide any "who-what-when-where-why type of historical fact issues," quoting Brown v. State, 230 N.J. 84, 99 (2017) (quoting Schneider v. Simonini, 163 N.J. 336, 359 (2000)).

The dissenting judge concluded that even taking into account all relevant circumstances in the light most favorable to Baskin, Detective Martinez did not violate Baskin's federal constitutional rights. The dissenting judge particularly focused on the events immediately before the shooting -- the fact that Baskin had crashed his car into a police vehicle and then fled through a residential neighborhood armed with a gun and therefore was a threat to the pursuing officers.

As to the critical moments in the backyard, the dissenting judge credited the account that "Martinez shot Baskin as he turned to face Martinez

10

immediately upon Martinez entering the backyard." She also accepted that in the "split second" that Martinez fired the shot, he "erred" because "Baskin was not holding a gun"; and "for purposes of the motion, [Baskin's hands] were empty." Nevertheless, the dissenting judge asserted, Martinez did not have "to wait for a suspect he knew to be armed and extremely dangerous to swing all the way around and face him so the detective could get a better look at the suspect's hands in the split second before he fired." For that reason, she found that "Detective Martinez's mistake [was] an objectively reasonable one under the 'tense, uncertain, and rapidly evolving' circumstances he faced," quoting Graham v. Connor, 490 U.S. 386, 397 (1989), and therefore would have affirmed the trial court's grant of summary judgment based on qualified immunity.

D.

Defendants filed a notice of appeal as of right based on the dissent in the Appellate Division. See N.J. Const. art. VI, § 5, ¶ 1(b); R. 2:2-1(a)(2). The issue before this Court is limited to the one raised in the dissent -- whether Detective Martinez was entitled to qualified immunity based on the summary judgment record and therefore whether the trial court properly dismissed Baskin's Section 1983 lawsuit against defendants. See R. 2:2-1(a)(2).

11

E.

The fault line dividing the Appellate Division majority and dissent likewise divides the parties. Baskin urges this Court to affirm the two-judge majority essentially for the reasons given in the majority opinion. Defendants ask this Court to adopt the reasoning of the dissenting judge and to confer on Detective Martinez qualified immunity and dismiss Baskin's Section 1983 lawsuit.

II.

A.

The primary focus of Baskin's lawsuit is his claim brought under 42 U.S.C. § 1983. "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" Gomez v. Toledo, 446 U.S. 635, 638 (1980) (quoting 42 U.S.C. § 1983). Essentially, "Section 1983 is a means of vindicating rights guaranteed in the United States Constitution and federal statutes." Gormley v. Wood-El, 218 N.J. 72, 97 (2014).

The specific constitutional right at issue here is the Fourth Amendment right of every person to be free from "unreasonable" seizures. See U.S. Const. amend. IV (declaring that "[t]he right of the people to be secure in their

12

persons . . . against unreasonable searches and seizures, shall not be violated"). The United States Supreme Court in <u>Graham</u> held that the use of excessive force in the course of an arrest constitutes an unreasonable seizure under the Fourth Amendment. <u>See</u> 490 U.S. at 394.[7]

"While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985) (citation omitted); <u>see also</u> <u>Brower v. County of Inyo</u>, 489 U.S. 593, 595 (1989) (noting that "a police officer's fatal shooting of a fleeing suspect constitute[s] a Fourth Amendment 'seizure'" (citing <u>Garner</u>, 471 U.S. at 7)). The United States Supreme Court has recognized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." <u>Garner</u>, 471 U.S. at 9.

---

[7] The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. <u>Ker v. California</u>, 374 U.S. 23, 33 (1963) (holding that the Fourth "Amendment's proscriptions are enforced against the States through the Fourteenth Amendment" and that "the standard of reasonableness is the same under the Fourth and Fourteenth Amendments").

The ultimate issue in analyzing any excessive-use-of-force claim under the Fourth Amendment is whether, from the police officer's perspective, the use of force was objectively reasonable under all the circumstances. Graham, 490 U.S. at 396-97; Saucier v. Katz, 533 U.S. 194, 201-02 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). In making that assessment, a court does not view the events at issue "with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97. Among the factors that should be considered in evaluating the reasonableness of an officer's use of force are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

To be sure, however, the United States Supreme Court has given notice that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Garner, 471 U.S. at 11. A police officer may only use deadly force against a suspect when "the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others."

14

Lamont v. New Jersey, 637 F.3d 177, 185 (3d Cir. 2011) (citing Garner, 471 U.S. at 3, 11; Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999)); see also O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003) ("It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.").

With those general principles in mind, we turn to the doctrine of qualified immunity.

## B.

The doctrine of qualified immunity generally protects government officials from civil liability for discretionary acts that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is intended to spare deserving public officials of the costs and expenses of litigation and standing trial, and therefore the qualified immunity defense is typically interposed early in the proceedings of a case, Saucier, 533 U.S. at 200-01, such as on a motion for summary judgment, Morillo v. Torres, 222 N.J. 104, 119 (2015). Whether an official is entitled to the shield of qualified immunity ordinarily is a question of law to be decided by the court. Brown, 230 N.J. at 98-99; see also Scott v. Harris, 550 U.S. 372,

15

381 n.8 (2007) (noting that after the court has "drawn all inferences in favor of the nonmoving party <u>to the extent supportable by the record</u>," the reasonableness of a police officer's actions "is a pure question of law").

In determining whether qualified immunity applies in a particular case, a court ordinarily must address two issues: (1) whether the evidence, viewed in the light most favorable to the plaintiff, establishes that the official violated the plaintiff's constitutional or statutory rights, and (2) whether the right allegedly violated was "clearly established" at the time of the officer's actions. <u>Saucier</u>, 533 U.S. at 201-02; <u>see also</u> <u>Morillo</u>, 222 N.J. at 117-18.[8] "[A] right is clearly established" if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Gormley</u>, 218 N.J. at 113 (alteration in original) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (holding that cases involving "fundamentally similar" or

---

[8] Since <u>Saucier</u>, the Supreme Court has clarified that courts have the discretion to address first the second prong -- whether the right was "clearly established" -- because a determination of that prong may be dispositive of the issue of qualified immunity. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236-37 (2009). If the right at issue is not clearly established, then the officer alleged to have violated that right will be entitled to qualified immunity. <u>See</u> <u>id.</u> at 243-45.

16

"materially similar" facts are not necessary for a clearly established finding, but rather, the "salient question" is whether the law gave the officer "fair warning" that his conduct was unlawful).

C.

Under the qualified immunity jurisprudence discussed, we are required not only to view the evidence in the light most favorable to Baskin, but also to draw all reasonable inferences in his favor that are supported by the summary judgment record. See Gormley, 218 N.J. at 86 ("[W]e must . . . view the summary-judgment record through the prism of [the plaintiff's] best case, giving [the plaintiff] -- the non-moving party -- the benefit of the most favorable evidence and most favorable inferences drawn from that evidence."). At this stage, we cannot give credence to Detective Martinez's account of the last moments of his encounter with Baskin, and we do not resolve disputed issues of material fact as would a jury. We must accept as true the testimony of Baskin and Johnson that as Detective Martinez rounded the corner of the house, Baskin was standing with his open and empty hands above his head -- not reaching for a weapon or making a threatening gesture. Perhaps, Baskin was in the act of turning at that moment, but even that is a disputed fact. Indeed, by placing his hands above his head and without saying a word, as

17

Baskin claims, he signaled in a language universally understood his intent to surrender.

Our constitutional jurisprudence makes clear what every police officer understands -- it is not objectively reasonable to shoot a person suspected of committing a crime after he has placed his empty hands above his head in an act of surrender. Jurisdictions that have addressed that scenario embrace that simple and seemingly incontrovertible proposition.

In Hemphill v. Schott, the plaintiff in a Section 1983 civil rights action had committed serious crimes, including assault with a deadly weapon, when confronted by a police officer. 141 F.3d 412, 417 (2d Cir. 1998). Accepting as true the plaintiff's "version of the facts" for summary judgment purposes, the United States Court of Appeals for the Second Circuit concluded that the officer's "alleged decision to use potentially deadly force upon a suspect who stopped and raised his arms in the air when commanded to do so [did] not qualify as reasonable" under the circumstances. Ibid. The court reasoned that, although the plaintiff was suspected of committing an "extremely violent" crime, "to allow the nature of the crime alone to justify the use of such severe force would thwart a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." Ibid. Thus, the court concluded that the

18

plaintiff's "statement of facts, construed most favorably to him, describe[d] a constitutionally unreasonable seizure" and therefore held that the trial court erred in granting summary judgment on qualified immunity grounds. Id. at 417-18.

In Gray-Hopkins v. Prince George's County, a Section 1983 excessive-force case, the summary judgment record presented two starkly different accounts of the shooting death of Hopkins after the police stopped the car in which he was a passenger. 309 F.3d 224, 227-28 (4th Cir. 2002). In the defendants' version, Hopkins grabbed an officer's gun and struggled for control of that gun when another officer fatally shot him. Id. at 228. In the plaintiff's version, Hopkins exited the vehicle and had his hands raised, and at no point threatened the officer or grabbed for his gun when he was shot dead by the other officer. Ibid. The United States Court of Appeals for the Fourth Circuit affirmed the district court's denial of qualified immunity because, based on the evidence supporting plaintiff's version, Hopkins was not resisting arrest or posing a threat to the safety of the officers and had "his hands raised over his head at the time of the fatal shot." Id. at 230-31. On those facts, the court held that "a trier of fact could clearly conclude that a Fourth Amendment violation occurred." Id. at 231.

Other jurisdictions have reached similar conclusions when a suspect had placed his hands in the air in an act of surrender. See, e.g., Henderson as Tr. for Henderson v. City of Woodbury, 909 F.3d 933, 939-40 (8th Cir. 2018) (finding that the trial court erred by granting qualified immunity because, based on the plaintiff's version of the facts, the suspect "fully and unequivocally surrendered to police, lay still, and was shot and killed anyway" in violation of the suspect's "clearly established constitutional rights"); Longoria v. Pinal County, 873 F.3d 699, 709-11 (9th Cir. 2017) (reversing grant of qualified immunity because material facts were disputed and because the suspect's "Fourth Amendment right not to be shot dead while unarmed, surrounded by law enforcement, and in the process of surrendering [was] clearly established"); Kanae v. Hodson, 294 F. Supp. 2d 1179, 1185-86 (D. Haw. 2003) ("In [the plaintiff's] version of events, [the officer] could see [the plaintiff's] hands in the air and therefore knew that shooting [him] would clearly violate [his] Fourth Amendment rights. Accordingly, the court concludes that [the officer] has not established that he is entitled to summary judgment on qualified immunity grounds." (emphasis added)); see also Ciminillo v. Streicher, 434 F.3d 461, 467-69 (6th Cir. 2006) (denying qualified immunity and noting that courts have found that it is not objectively reasonable to use deadly force even "against a visibly armed plaintiff who had

20

his hands over his head in the surrender position" (internal quotation omitted)).[9]

The law is also clear that a suspect's conduct leading up to his attempt to surrender cannot alone justify shooting the suspect -- using deadly force against him -- when his hands are above his head in an act of submission and he no longer poses a threat. Thus, "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." Lytle v. Bexar County, 560 F.3d 404, 413 (5th Cir. 2009); see also Lamont, 637 F.3d at 184 ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); Waterman

_____

[9] A case that reached a different conclusion is not in any way similar to the circumstances here. In Conde ex rel. Estate of Mack v. City of Atlantic City, a police officer responded to a report of a man armed with a gun. 293 F. Supp. 3d 493, 497 (D.N.J. 2017). On his arrival at the scene, the officer commanded Derrick Mack to stop. Id. at 505. Mack turned toward the officer with only one hand raised and the other hand near his waistband area. Id. at 502-03. Independent eyewitnesses supported the officer's version of events. Id. at 503-04. One eyewitness explained that Mack never fully stopped and that "both hands did not come straight up in the air in a surrender posture." Id. at 503. Instead, Mack's "left [hand] came up first and then the right began to rise as Mack appeared to turn toward the officer." Ibid. It was then that the officer shot Mack, who later died of his wounds. Id. at 497-98, 502. On that summary judgment record, the district court concluded that "the undisputed evidence shows that, at the very least, the possibility existed for Mack to reach into his waistband, where [the officer] and others state he holstered the weapon." Id. at 506. On those facts, the court granted the officer qualified immunity. Id. at 501-02. The summary judgment record here is very different.

21

v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

### III.

The law is not in doubt here, however disputed the facts may be about whether Baskin's hands were empty and up in the air just moments before the shooting. Although for qualified immunity purposes, we must consider the totality of the circumstances through the perspective of an objectively reasonable police officer on the scene -- an officer facing "tense, uncertain, and rapidly evolving" events, Graham, 490 U.S. at 396-97 -- we must also accept Baskin's version of those events that are in dispute and draw all reasonable inferences in his favor. In rendering a decision on qualified immunity, we do not sit as a trier of fact, weighing the evidence and making credibility determinations. That role is exclusively reserved for the jury in our system of justice.

We understand that police officers must often make split-second decisions in highly volatile situations. We do not minimize the challenges or

22

dangers facing a police officer engaged in pursuit of a suspect who is observed carrying a gun. Here, Baskin does not dispute that he attempted to elude the police, crashing his car into Detective Martinez's unmarked patrol vehicle, and that he took flight armed with a gun. We accept that Detective Martinez had a legitimate and obvious basis to be concerned for his safety. During the chase, had Baskin turned toward him with the gun in his hand, Detective Martinez would likely have had an objectively reasonable basis to use deadly force to protect himself from the threat of death or serious bodily injury. However, the justification for use of deadly force at one point in a dangerous encounter does not give an officer the right to shoot a suspect when the use of deadly force can no longer be justified. See, e.g., Lytle, 560 F.3d at 413. Although police officers would have a right to use deadly force against a suspect during a gun battle, they would not have a right to shoot the suspect after he threw down his weapon, placed his hands over his head, and surrendered. Cf. Lamont, 637 F.3d at 184.

Detective Martinez said that when he rounded the corner of the house, Baskin turned toward him pointing an object that appeared to be a gun. If that account were uncontested, and the object was, say a cell phone, Detective Martinez's objectively reasonable mistake of fact would not preclude his entitlement to qualified immunity. See Saucier, 533 U.S. at 205 ("If an officer

23

reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").

But that account is sharply contested. And as earlier noted, under the qualified immunity and summary judgment standards that govern our review, based on the testimony of Baskin and a neighborhood eyewitness, we must accept that Baskin had his empty hands above his head in a sign of surrender, made no threatening gestures, and no longer posed a threat. Under that scenario, an objectively reasonable police officer would not have had a justification to use deadly force.

The two conflicting accounts of what occurred at the time of the shooting, and any other disputed issues of material fact, must be submitted to a jury for resolution. See Brown, 230 N.J. at 99. After the jury makes its ultimate findings, the trial court can determine the merits of the application for qualified immunity. See ibid.

## IV.

In summary, the law prohibiting the use of deadly force against a surrendering suspect -- one with empty hands in the air and posing no imminent threat -- was clearly established at the time of the events in this case. Based on the facts that we must accept as true for purposes of determining the

24

issue of qualified immunity on the summary judgment record, an objectively reasonable police officer would not have been justified in using deadly force. Therefore, the trial court erred in granting Detective Martinez qualified immunity and dismissing Baskin's Section 1983 lawsuit. Where the ultimate truth lies is a matter for a jury to determine. After the jury makes its factfindings, Detective Martinez is free to renew his qualified immunity application if there is a basis to do so.

Accordingly, we affirm the judgment of the Appellate Division and remand for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and TIMPONE join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.

Bryheim Jamar Baskin,

Plaintiff-Respondent,

v.

Rafael Martinez, City of Camden and
Scott Thompson,

Defendants-Appellants.

JUSTICE SOLOMON, dissenting.

This appeal as of right requires the Court to determine whether the

Appellate Division correctly reversed the trial court's grant of summary

judgment in favor of a police officer who pursued and shot a fleeing suspect.

It is undisputed that the suspect possessed a handgun throughout the pursuit

and, while out of the officer's view, discarded his weapon in the backyard

where he was shot. It is disputed whether the suspect's hands were empty and

raised as he turned toward the officer and was shot.

The Appellate Division majority concluded that the contents and

position of the suspect's hands were disputed material facts precluding

summary judgment. The dissent asserted that the qualified immunity doctrine

required that summary judgment be granted in favor of the officer because his actions were reasonable considering the totality of the circumstances, irrespective of the disputed facts.

The majority concludes that viewing the disputed facts in the light most favorable to the suspect -- who resisted arrest, crashed into a police car, and fled on foot through a residential neighborhood while armed with a handgun -- the officer's use of deadly force as he turned a blind corner and, for an instant, saw the suspect turn with raised hands, was the result of an unreasonable "mistaken understanding." Saucier v. Katz, 533 U.S. 194, 205 (2001). I disagree. Even if a jury were to resolve the disputed facts in Baskin's favor, Martinez would still be entitled to qualified immunity, and therefore I dissent.

## I.

The summary judgment record reveals that early one afternoon, the Camden Police Department deployed its Strategic Multi-Agency Shooting and Homicide Team (the Team), consisting of two unmarked police vehicles and five uniformed police officers, to canvass a high-crime neighborhood where there had been recent shootings. While on patrol, the Team observed plaintiff Bryheim Jamar Baskin enter a vehicle and exit a parking lot without signaling. The Team arranged for one unit to provide backup while the other performed a vehicle stop.

2

Baskin initially pulled over, but then sped off in reverse and crashed into the backup vehicle occupied by Detective Rafael Martinez and his partner. After the collision, Baskin got out of his car and fled on foot. Martinez gave chase and heard an officer yell "gun." Martinez also observed the butt of a handgun in Baskin's right pocket during the chase.

Followed by other officers, Martinez pursued Baskin through a residential area and over several fences. As Baskin turned down an alley, the handgun fell from his pocket, and Martinez observed Baskin reach down, pick it up, and continue on, pistol in hand. As Martinez moved through the alley, he lost sight of Baskin, who ran into a backyard, where a wall blocked his exit. At that time, Martinez unholstered his service weapon and continued the pursuit. Once Martinez neared the end of the alley, he positioned himself to gain a full view of the backyard, unaware that a wall blocked Baskin's exit. At that moment, Baskin began to turn around. Martinez fired a single round into Baskin's torso.

Baskin was taken by ambulance to a nearby hospital where he was treated for serious and permanent injuries and survived. At the time of Baskin's arrest, he possessed $1000 and less than a half-ounce of cocaine. In addition, the police retrieved two cell phones near where Baskin fell, and a

3

semiautomatic handgun loaded with eleven hollow-point bullets elsewhere in the backyard.

The Camden County Prosecutor's Office (the Prosecutor's Office) investigated the incident. The Prosecutor's Office concluded that Martinez's actions were justified under N.J.S.A. 2C:3-4 and 3-5 because he "reasonably believed Bryheim Baskin's actions placed him in imminent danger of death or bodily injury." The New Jersey Attorney General's Office, Division of Criminal Justice, reviewed the Prosecutor's Office's investigation and agreed with its determination. Baskin was later charged in a fourteen-count indictment and pled guilty to four of the criminal charges filed against him: second-degree eluding an officer, N.J.S.A. 2C:29-2; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5; third-degree resisting arrest, N.J.S.A. 2C:29-2; and possession with intent to distribute less than half an ounce of cocaine, N.J.S.A. 2C:35-5. Baskin was ultimately sentenced to a four-year term of imprisonment.

During his plea colloquy, Baskin admitted he was aware police officers "pulled up behind [him] and attempted to stop [his] vehicle." Baskin acknowledged that "instead of stopping, [he] attempted to elude those officers by speeding off at a high rate of speed," thereby "creat[ing] a risk of harm or injury to the pursuing officers and also to the population [and] community at

4

large." Baskin also testified that, at times during the pursuit, he looked back to see if the uniformed police officers continued to pursue him.

Thereafter, Baskin filed a complaint under 42 U.S.C. § 1983 (Section 1983) against Martinez, the City of Camden, and the Chief of Police of the Camden Police Department (collectively, defendants). Baskin claimed that Martinez's use of excessive force at the time of Baskin's apprehension and arrest violated his federal constitutional rights.

Baskin testified in a deposition taken during discovery in the Section 1983 action that his path was blocked by a brick wall at the end of the backyard where he was shot, and that he discarded his handgun in that yard, remained silent, and put his empty, open hands up near his ears to signal his surrender. According to Baskin, he was shot as he turned to face Martinez. An eyewitness, in a statement to police and at her deposition, stated that Baskin was shot when he put his empty hands in the air and began to turn around. No evidence places Baskin's hands above his head when he was shot.

At Martinez's deposition in the Section 1983 action, he testified that he proceeded down the alley believing Baskin was armed. Martinez stated that as Baskin turned around, his arms were extended at a "90-degree angle," "pointing straight in front of him," and that he had a "black object" "[i]n his right hand."

At the conclusion of discovery, the trial court granted defendants' motion for summary judgment, finding that Martinez was entitled to qualified immunity because his use of deadly force was reasonable under the totality of the circumstances. Baskin appealed. The Appellate Division reversed in a split decision. The majority concluded that the contents and position of Baskin's hands during the shooting were disputed issues of material fact precluding summary judgment. The dissenting judge asserted that Martinez is entitled to qualified immunity because he acted reasonably under the totality of the circumstances, even under Baskin's version of the disputed facts; I agree.

## II.

Baskin brought this action under Section 1983, which "provides a cause of action for a person who has been deprived of his or her well-established federal constitutional or statutory rights by any person acting under the color of state law." Schneider v. Simonini, 163 N.J. 336, 353 (2000). A police officer like Martinez, performing his or her official duties, acts under the color of state law. See State v. Crawley, 187 N.J. 440, 460-61 (2006) (holding that a police officer who lawfully performs official functions and acts in objective good faith operates "under color of law in the execution of his duties").

The doctrine of qualified immunity, meanwhile, allows police officers "to perform their duties without being encumbered by the specter of being

6

sued personally for damages, unless their performance is not objectively reasonable." Morillo v. Torres, 222 N.J. 104, 108 (2015). Qualified immunity thus serves as an affirmative defense to shield law enforcement from liability for discretionary actions taken while acting reasonably under the color of state law. Brown v. State, 230 N.J. 84, 97-98 (2017). In this way, "[q]ualified immunity protects all officers 'but the plainly incompetent or those who knowingly violate the law.'" Connor v. Powell, 162 N.J. 397, 409 (2000) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see, e.g., Morillo, 222 N.J. at 108 (dismissing civil rights causes of action because "[i]t cannot be said as a matter of law that no reasonably competent officer would have believed that probable cause existed").

In practice, the "defense of qualified immunity interposes a significant hurdle for plaintiffs seeking to recover for asserted violations of civil rights at the hands of law-enforcement officials." Morillo, 222 N.J. at 116. That hurdle comes into particularly sharp relief at the summary judgment stage. Generally, summary judgment is proper when, viewed in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." RSI Bank v. Providence

Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018) (quoting R. 4:46-2(c)). In the qualified immunity context, "if 'a reasonable officer could have believed that his conduct was justified,' the police officer is entitled to qualified immunity" -- and, thus, summary judgment -- as a matter of law. Conde v. City of Atlantic City, 293 F. Supp. 3d 493, 506 (D.N.J. 2017) (quoting City & County of San Francisco v. Sheehan, 575 U.S. 600, 135 S. Ct. 1765, 1777 (2015)).

Generally, "application of the defense of qualified immunity is a legal question for the court rather than the jury" that should be raised before trial. Brown, 230 N.J. at 98-99; see also Pearson v. Callahan, 555 U.S. 223, 232 (2009) (noting "the importance of resolving immunity questions at the earliest possible stage in litigation" (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991))). Because the grant of qualified immunity "relieves an eligible defendant from the burden of trial," Brown, 230 N.J. at 99, "a summary judgment motion is an appropriate vehicle for deciding that threshold question of immunity when raised," Morillo, 222 N.J. at 119.

Courts apply a two-pronged test in analyzing whether an officer is entitled to qualified immunity. Bennett v. Murphy, 274 F.3d 133, 136-37 (3d Cir. 2001); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). First, a court must determine whether, "'[t]aken in the light most favorable to the party asserting the injury,'" the facts alleged "show that the challenged conduct

8

violated a statutory or constitutional right.  Second, the court must determine 'whether the right was clearly established.'"  Morillo, 222 N.J. at 117 (alteration in original) (citation omitted) (quoting Saucier, 533 U.S. at 201). "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  Saucier, 533 U.S. at 205.

Courts decide the legal issue of qualified immunity by applying that test when there are no disputed material historical or foundational facts.  Morillo, 222 N.J. at 119.  Where material facts are in dispute, however, the jury may determine "the who-what-when-where-why type of historical fact issues." Brown, 230 N.J. at 99 (quoting Schneider, 163 N.J. at 359); see Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002) ("[T]he existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue."); see also Hill v. Algor, 85 F. Supp. 2d 391, 401 (D.N.J. 2000) ("[W]here factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law.").  But cf. Schneider, 163 N.J. at 360 ("hold[ing] that[,] in Section 1983 cases when disputed historical facts are relevant to either

9

probable cause or the existence of a reasonable, but mistaken, belief concerning its existence, the trial court must submit the disputed factual issue to the jury," but finding that trial court's resolution of factual dispute was "harmless error" in light of Court's probable cause analysis).

To resolve whether Martinez acted in an objectively reasonable manner and was thus entitled to qualified immunity as a matter of law or whether a factual dispute required that the case be presented to a jury, we consider the specific contours of Baskin's Section 1983 claim. See Saucier, 533 U.S. at 205 (holding that the qualified immunity inquiry "must accommodate limitless factual circumstances").

## III.

The right to be free from "unreasonable searches and seizures" under the Fourth Amendment of the United States Constitution is the well-established constitutional right Baskin asserts was violated in this case. Baskin contends that he had a "clearly established" constitutional right to be free from Martinez's use of deadly force, which was "excessive under objective standards of reasonableness." Id. at 201-02; see also Kopec v. Tate, 361 F.3d 772, 776-78 (3d Cir. 2004) (Fourth Amendment allows law enforcement to exercise only "objectively reasonable" force in effectuating arrest). Martinez counters that Baskin's constitutional right was not clearly established because

"a reasonable officer could have believed that [Martinez's] conduct was justified." Sheehan, 135 S. Ct. at 1777. The Court is obliged to consider what constitutes a "clearly established" right for qualified immunity purposes in general and in the context of an alleged violation of the Fourth Amendment in particular.

A.

Many Section 1983 cases rise or fall on the "clearly established" prong of qualified immunity. See, e.g., Brown, 230 N.J. at 90 (holding officer did not violate clearly-established right given "the lack of clarity in the law"); Morillo, 222 N.J. at 125 ("This was not a setting in which the application of the statutory exemption . . . was 'clearly established' in the framework of our law.").

A clearly established right is one of which the contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "The dispositive point in determining whether a right is clearly established is whether a reasonable officer in the same situation clearly would understand that his actions were unlawful." Morillo, 222 N.J. at 118. In other words, "[i]f it would not have been clear to a reasonable officer what

11

the law required under the facts alleged, he is entitled to qualified immunity." Bennett, 274 F.3d at 136-37 (emphasis added).

As such, it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 580 U.S. ___, 137 S. Ct. 548, 552 (2017) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Indeed, "the clearly established law must be 'particularized' to the facts of the case." Ibid. (quoting Anderson, 483 U.S. at 640); see Sheehan, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). A contrary standard would allow plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." White, 137 S. Ct. at 552 (quoting Anderson, 483 U.S. at 639).

B.

Importantly, the Supreme Court of the United States has emphasized that the "clearly established" prong's requisite particularity and "specificity [are] especially important in the Fourth Amendment context." Mullenix v. Luna, 577 U.S. ___, 136 S. Ct. 305, 308 (2015).

Once again, the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier, 533 U.S.

at 202. The Fourth Amendment's reasonableness standard "is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). As such, courts take a "totality of the circumstances" approach in analyzing the reasonableness of a law enforcement officer's use of force. See Tennessee v. Garner, 471 U.S. 1, 8-9 (1985); see also Abraham v. Raso, 183 F.3d 279, 289 (3d Cir. 1999) ("[R]easonableness should be assessed in light of the 'totality of the circumstances . . . .'" (quoting Graham v. Connor, 490 U.S. 386, 396 (1989))).

Proper application of the reasonableness test requires special "attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." DelaCruz v. Borough of Hillsdale, 183 N.J. 149, 165 (2005) (quoting Graham, 490 U.S. at 396). The analysis also "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Curley, 499 F.3d at 207 (quoting Graham, 490 U.S. at 396).

When balancing the government's interest against the nature of the intrusion, the reasonableness of an officer's "use of force must be judged from

13

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." DelaCruz, 183 N.J. at 165 (quoting Graham, 490 U.S. at 396). That allows reviewing courts to take into account that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 167-68 (quoting Graham, 490 U.S. at 396-97). Hence, the Fourth Amendment does not require that an officer be correct -- it merely requires that the officer act reasonably. See Heien v. North Carolina, 574 U.S. 54, 60-61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials . . . ."); see also Bennett, 274 F.3d at 137 ("An officer may still contend that he reasonably, but mistakenly, believed that his use of force was justified by the circumstances as he perceived them . . . ."); DelaCruz, 183 N.J. at 167 ("[A]n officer is free to argue that his conduct was reasonable in conjunction with his version of the facts.").

The Court's emphasis on specificity in the context of a qualified immunity analysis in response to an alleged violation of the Fourth Amendment recognizes that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to

14

the factual situation the officer confronts." Mullenix, 136 S. Ct. at 308 (alteration in original) (quoting Saucier, 533 U.S. at 205).

For example, in Brosseau v. Haugen, the Supreme Court of the United States reversed the Ninth Circuit's denial of qualified immunity to an officer who shot and killed a fleeing felon. 543 U.S. 194, 201 (2004). The Ninth Circuit had found that the officer violated the rule set forth in Garner -- that "deadly force is only permissible where 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" Haugen v. Brosseau, 339 F.3d 857, 873 (9th Cir. 2003) (quoting Garner, 471 U.S. at 11). The Supreme Court disagreed and held that the circuit court's reliance on the "general test[]" for excessive force set out in Garner "was mistaken." Brosseau, 543 U.S. at 199. The correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the "'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [were] at risk from that flight." Id. at 199-200 (quoting Saucier, 533 U.S. at 202).

Similarly, in Mullenix, the issue before the Supreme Court was whether the Fifth Circuit properly held that a police officer violated a clearly established right when he shot and killed a fleeing motorist during a

15

high-speed chase. 136 S. Ct. at 307-08. The Court discussed excessive force cases that involved car chases, "reveal[ing] the hazy legal backdrop against which [the officer] acted." Id. at 309. According to the Court, even accepting that the factual circumstances before it "fall somewhere between" cases in which the force used was found excessive and those in which it was found to be reasonable, "qualified immunity protects actions in the 'hazy border between excessive and acceptable force.'" Id. at 312 (quoting Brosseau, 543 U.S. at 201).

Those cases reveal the context-dependent inquiry that must be performed here to determine whether Martinez is entitled to qualified immunity. Although Martinez used deadly force against Baskin, the use of deadly force is not per se unreasonable. Garner, 471 U.S. at 11. The Court must therefore consider Martinez's use of deadly force in the totality of the circumstances present in this case. Graham, 490 U.S. at 396.

## IV.

I agree with the Appellate Division dissent that summary judgment is not precluded by the existence of a genuine issue of fact as to whether Baskin's hands were empty and raised at the time of his shooting. See, e.g., Conde, 293 F. Supp. 3d at 505-06 (holding that the officer's use of deadly force was not unreasonable where the suspect's hands were raised because the possibility

16

existed for the suspect to reach into his waistband for the weapon he was believed to be carrying). Even if an officer is mistaken in believing a suspect is armed, qualified immunity will still apply if the officer's mistaken belief was objectively reasonable. See, e.g., Krueger v. Fuhr, 991 F.2d 435, 439 (8th Cir. 1993) (noting that, "even assuming" the suspect fatally shot by an officer was established to have been "unarmed at the time of the shooting, that fact would not preclude entry of [summary] judgment" in favor of the officer whose "belief that he was facing an armed and dangerous suspect was objectively reasonable"); Conde, 293 F. Supp. 3d at 505 ("[A]s long as [the officer's] belief that [the suspect] was armed is reasonable, qualified immunity applies even if [the officer] was mistaken."). Furthermore, Martinez's actions are considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." DelaCruz, 183 N.J. at 165 (quoting Graham, 490 U.S. at 396). Even if Baskin's account of the events is accepted as true for purposes of summary judgment, Martinez reasonably believed that he confronted an armed and dangerous suspect who posed an immediate threat to his life when he shot Baskin.

Here, before he was restrained, Baskin threatened the lives of police officers and the general public by speeding away from one police vehicle and crashing into another. Baskin, armed with a gun, then fled the scene of the

17

crash on foot and led the police on a pursuit through a residential neighborhood in the middle of the afternoon. Baskin thus "openly . . . exhibited a total willingness to commit dangerous acts against police officers" and displayed an "apparent disregard for innocent bystanders." Ridgeway v. City of Woolwich Twp. Police Dep't, 924 F. Supp. 653, 658 (D.N.J. 1996).

Additionally, Baskin posed "an immediate" threat because he was in possession of a handgun while actively resisting arrest. DelaCruz, 183 N.J. at 165 (quoting Graham, 490 U.S. at 396). Those facts reasonably led Martinez to conclude that Baskin, who had committed serious crimes "involving the infliction or threatened infliction of serious physical harm" -- crashing into a police vehicle in an attempt to escape -- was dangerous and willing to use deadly force against the officer and others. Garner, 471 U.S. at 11-12.

Martinez unholstered his service weapon only after he entered the alley and observed Baskin pick up the gun from the ground and run out of Martinez's view into a backyard. It was then that Baskin threw his gun away. As Martinez rounded the corner and for an instant saw Baskin turn towards him, Martinez's belief that Baskin was armed -- even if mistaken -- was reasonable given the "tense, uncertain, and rapidly evolving" circumstances before him. DelaCruz, 183 N.J. at 167 (quoting Graham, 490 U.S. at 397).

The totality of the circumstances establishes that a reasonable officer at the scene would have no reason to know, in the split second that Martinez fired his weapon, that Baskin no longer possessed a gun. Thus, considering the alleged facts in a light most favorable to Baskin -- that his hands were empty and raised -- Martinez's belief in the need to use deadly force to prevent Baskin's escape and protect against the threat of danger Baskin posed to Martinez and others was reasonable given the totality of the circumstances from the perspective of an officer on the scene. Particularizing the law to the facts of the case, White, 137 S. Ct. at 552, Martinez's use of deadly force falls within Garner's parameters because "a reasonable officer could have believed that [Martinez's] conduct was justified." Sheehan, 135 S. Ct. at 1777 (quoting Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002)). The record establishes that Martinez acted reasonably under extraordinarily dangerous circumstances, and that defendants are therefore entitled to qualified immunity as a matter of law. Accordingly, I dissent.